UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

PORT AUTHORITY POLICE          :
BENEVOLENT ASSOCIATION, INC.,    :
                                       :
             Plaintiff,        :
                                        :     16cv3907
           -against-          :
                                        :     OPINION & ORDER
PORT AUTHORITY OF NEW YORK    :
AND NEW JERSEY,                        :
                                        :
             Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, District Judge:

         The Port Authority Police Benevolent Association, Inc. ("PAPBA") brings this

action against the Port Authority of New York and New Jersey (the "Port Authority"), asserting

violations of the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act

("FMLA").  More specifically, PAPBA challenges Port Authority policies requiring its police

officers to submit to annual medical examinations and fitness-for-duty examinations.  Both

parties move for summary judgment.  PAPBA's motion for summary judgment is granted as to

Count I.  PAPBA and the Port Authority's motions for summary judgment are granted in part as

to Count II.  The Port Authority's motion for summary judgment is granted as to Count III.  The

parties' motions are denied in all other respects.

BACKGROUND

         This action concerns the proper balance between the privacy interests of Port

Authority police officers and the public interest in security and safety at Port Authority facilities.

The Port Authority is an interstate governmental agency that operates transportation facilities in

the New York metropolitan area, including airports; bridges; tunnels; train, bus, and marine

terminals; and the World Trade Center site.  (Plaintiff's Response to Defendant's Rule 56.1

Statement ¶¶ 1-2.)  There are 1,570 police officers within the Port Authority's sworn ranks, and

all of them are members of PAPBA, the labor union that represents non-supervisory sworn

personnel.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶¶ 3-4.)

       PAPBA negotiated with the Port Authority over the terms and conditions of

employment for police officers.  Those terms and conditions are embodied in a Memorandum of

Agreement (the "MOA") that spans 419 pages and meticulously describes seemingly every facet

of employment.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 5; see Declaration

of Kathleen Gill Miller, dated June 6, 2017, ECF No. 33 ("Miller Decl."), Ex. A.)  The Port

Authority negotiated for the right to conduct annual medical examinations, and PAPBA agreed

to such examinations in return for a paid day off.  The annual medical examination is referenced

in Section XIV.12 of the MOA, titled "Overtime: Compensatory Time."  (See Miller Decl., Ex.

A, at 20.)  References to fitness-for-duty examinations are also sprinkled throughout the MOA's

provisions relating to long term leave, military leave, and sick leave.  (See Miller Decl., Ex. A, at

27, 227, 331.)  But in an ironic twist, having negotiated certain benefits for its members, PAPBA

now claims they violate the ADA and FMLA.

I.    Port Authority Police Officer Job Responsibilities

       The MOA generally describes the job duties of Port Authority police officers as

including: (1) patrolling Port Authority facilities on foot or by vehicle; (2) operating various

emergency vehicles; and (3) being responsible for the "protection of life and property at a facility

on an assigned tour."  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶¶ 8-9; see also

Miller Decl., Ex. A, at 212-14.)  In short, Port Authority police officers are responsible for the

security of the Port Authority's facilities and the safety of people using them.  (Plaintiff's

Response to Defendant's Rule 56.1 Statement ¶ 6.)  Their duties encompass responding to various emergencies, including "criminal activity, fire, sick or injured patrons, vehicular accidents, traffic problems, terrorist activity, and bomb threats."  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 7.)  The parties do not dispute that Port Authority officers carry and/or use firearms and are authorized to make arrests.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 8.)  The MOA further recognizes that police officers' duties may include "[c]ontinual standing and/or walking," "[o]ccasional running and/or physically demanding activities," and "[using] firearms skillfully."  (See Miller Decl., Ex. A, at 214.)

II.     Mandatory Medical Examinations

        A.   Annual Medical Examinations

The Port Authority requires police officers to submit to two types of medical examinations, which are the focus of the parties' summary judgment motions.  First, PAPBA members must submit to an annual medical examination that includes completion of a questionnaire (the "Health Questionnaire") as well as a full physical examination.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 12.)  The Health Questionnaire poses an array of questions that probe an officer's physical and mental health history.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 13; Affidavit of Robin Martin, dated April 25, 2017, ECF No. 35 ("Martin Aff. II"), Ex. C.)

The physical examination consists of a battery of tests performed by Port Authority doctors, including (1) blood work to detect conditions including diabetes and anemia; (2) kidney- and liver-function tests to detect conditions including alcohol use or high blood pressure; (3) a chest X-ray to detect conditions including lung cancer, pulmonary function, and heart condition; (4) a urinalysis to detect conditions including diabetes or infection; (5) a vision

test; (6) a hearing test; (7) an electrocardiogram; and (8) a hernia exam for male officers.
(Plaintiff's Response to Defendant's Rule 56.1 Statement ¶¶ 14-15.)  The annual examination is
the same for all Port Authority police officers, "regardless of the officer's rank or job
assignment."  (Defendant's Response to Plaintiff's Rule 56.1 Statement ¶ 5; <u>see also</u> Martin
30(b)(6) Dep. Tr.[1] at 37:13-39:12, 48:10-48:18 (confirming that all officers—including police
officers, sergeants, detectives, lieutenants, captains, and above—are subject to the annual
physical examination).)  Interestingly, it appears that no Port Authority police officer has been
discharged as a result of failing the annual medical examinations.  (Oral Arg. Hr'g Tr. at 35:4-
35:15.)

B. <u>Fitness-for-Duty Examinations</u>

1. <u>Injured-on-Duty Fitness-for-Duty Examinations</u>

The Port Authority requires police officers to report to the Office of Medical
Services ("OMS") for periodic fitness-for-duty examinations if the officer is absent because he is
injured on duty.  An officer who is injured on duty must report to OMS within 24 hours (if
possible) to be examined by a Port Authority doctor so that OMS can authorize the appropriate
treatment under workers' compensation, which covers all officers injured on duty.  (Plaintiff's
Response to Defendant's Rule 56.1 Statement ¶¶ 21-23.)  Thereafter, an officer injured on duty
must generally report to OMS every two weeks for evaluation or for reauthorization of treatment.
(Plaintiff's Response to Defendant's Rule 56.1 Statement ¶¶ 24-25; Martin 30(b)(6) Dep. Tr. at
50:7-51:10.)  However, OMS's Medical Director acknowledged that the two-week frequency of

---

[1]     The parties have appended to their motion papers various excerpts of the February 8, 2017 Rule 30(b)(6)
deposition of Robin Martin, the Medical Director of the Office of Medical Services for the Port Authority.  (<u>See</u>
Miller Decl., Ex. C; Decl. of Christopher P. Lenzo, ECF No. 51 ("Lenzo Decl."), Ex. 5; Decl. of Kathleen Gill
Miller, dated July 5, 2017, ECF No. 39 ("Miller Opp. Decl."), Ex. K.)  References to "Martin 30(b)(6) Dep. Tr." are
to those excerpts, wherever they may be appended.

subsequent visits was a "general guideline," (Martin 30(b)(6) Dep. Tr. at 50:24-50:25), and that frequency depended on the nature of the injury or condition.  (Martin 30(b)(6) Dep. Tr. at 46:22-47:14, 49:9-49:20; 61:24-62:19; Miller Decl., Ex. D (providing for re-evaluation of employees not fit for duty every two to four weeks "depending on the nature of the illness").)  Thus, in some circumstances, follow up visits might not be scheduled.  (Martin Aff. II ¶ 9.)

As for their substance, these fitness-for-duty examinations are "specific to the injury, or any other systems that could affect the injury or that could affect the ability for that employee to perform the full duties" of the position.  (Martin 30(b)(6) Dep. Tr. at 62:11-62:19.)  Under the operative OMS protocol, these examinations—which "encompass the evaluation and the follow up of occupationally related injuries"—are comprised of (1) an "appropriate medical history as to complaints and symptoms, medication, allergies, etc."; (2) a physical examination "consistent with [the] chief complaint and as extensive as needed to formulate [a] working diagnosis"; and (3) "x-rays, laboratory tests, or multiphasic evaluations to help confirm diagnosis."  (Miller Decl., Ex. D; see also Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 27.)

2.  Sick Leave Fitness-for-Duty Examinations

Police officers on leave for illness or injuries that were not sustained on the job follow a slightly different protocol.  They are required to report to OMS on the sixth day of absence, if possible.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 31.)  Following that initial examination, the officer is ordinarily required to report to OMS every two to four weeks, depending on the nature of the illness or injury.  (Defendant's Response to Plaintiff's Rule 56.1 Statement ¶ 13; Lenzo Decl., Ex. 19.)  According to the OMS Medical Director, this examination includes (1) a medical history directed to the reasons the employee is absent and

what the symptoms are; and (2) a medical examination tailored to the illness or injury.  (Martin 30(b)(6) Dep. Tr. at 69:3-69:19.)  The relevant OMS protocol governing sick leave examinations confirms that the physical examination should be "consistent with [the] chief complaint and as extensive as needed to formulate [a] working diagnosis."  (Lenzo Decl., Ex. 19.)

<u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The moving party has the burden of demonstrating the absence of any genuine dispute as to a material fact.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  In reviewing the record to determine whether there is a genuine issue to be tried as to any material fact, the court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  <u>Beyer v. City of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (quotation marks omitted); <u>see</u> <u>Anderson</u>, 477 U.S. at 251-52 (the court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  When parties file dueling motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  <u>Coutard v. Mun. Credit Union</u>, 848 F.3d 102, 114 (2d Cir. 2017) (quotation marks omitted); <u>see also</u> <u>Standard Gen. L.P. v. Travelers Indem. Co. of Conn.</u>, --- F. Supp. 3d ---, 2017 WL 3601181, at *2 (S.D.N.Y. Aug. 18, 2017).

<u>DISCUSSION</u>

I.      <u>Counts I and II – ADA Claims</u>

        A.  <u>Applicable Law</u>

        The ADA prohibits "discriminat[ion] against a qualified individual on the basis of

disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a).  While this general prohibition against discrimination

includes "medical examinations and inquiries," 42 U.S.C. § 12112(d)(1), it is not without

exceptions.  In particular, "a covered entity shall not require a medical examination and shall not

make inquiries of an employee as to whether such employee is an individual with a disability or

as to the nature or severity of the disability unless such examination or inquiry is shown to be

job-related and consistent with business necessity."[2]  42 U.S.C. § 12112(d)(4)(A); <u>see also</u> 29

C.F.R. §§ 1630.13(b); 1630.14(c).  In addition, the ADA permits covered entities to "make

inquiries into the ability of an employee to perform job-related functions."  42 U.S.C.

§ 12112(d)(4)(B); <u>see also</u> 29 C.F.R. 1630.14(c).  Accordingly, PAPBA's ADA claims turn on

whether the annual medical examinations and fitness-for-duty examinations (1) constitute a

"narrowly tailored inquiry into the employee's ability to carry out [the employee's] job related

functions"; and (2) are job-related and consistent with business necessity, if such examinations

reveal a disability or the nature or severity of a disability.  <u>Conroy v. N.Y. State Dep't of Corr.</u>

<u>Servs.</u>, 333 F.3d 88, 94, 97 (2d Cir. 2003).

---

[2]      The annual medical examinations and fitness-for-duty examinations could also conceivably fall within
§ 12112(b)(6), which prohibits employers from "using qualification standards, employment tests or other selection
criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities"
unless the standard, test, or selection criteria is "job-related for the position in question and is consistent with
business necessity."  42 U.S.C. § 12112(b)(6).  But this Court need not analyze this provision because neither party
briefed its application.

In <u>Conroy</u>, the Second Circuit introduced guidelines for determining how the "business necessity" defense under § 12112(d)(4)(A) may be satisfied.  See <u>Conroy</u>, 333 F.3d at 97 (interpreting § 12112(d) as a matter of first impression).[3]  To demonstrate a "business necessity," an employer "must first show that the asserted 'business necessity' is vital to the business."  <u>Conroy</u>, 333 F.3d at 97 (employer cannot merely demonstrate that an examination or inquiry is "convenient or beneficial" to its business).  An employer "must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary."  <u>Conroy</u>, 333 F.3d at 98.  The employer "need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal."  <u>Conroy</u>, 333 F.3d at 98.  Moreover, an employer "cannot merely rely on reasons that have been found valid in other cases but must actually show that the general [examination or inquiry] requirement contributes to the achievement of those business necessities."  <u>Conroy</u>, 333 F.3d at 101.

To be sure, this case presents a different problem than those cases where an individual employee challenges a medical examination or inquiry required by the employer.  Here, by contrast, PAPBA challenges the Port Authority's <u>general</u> policy requiring police officers to undergo periodic annual medical examinations and fitness-for-duty examinations.

---

[3]      Throughout, both parties cite to various portions of the Equal Employment Opportunity Commission's (EEOC) enforcement guidance titled "Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act" (the "Inquiries and Examinations Enforcement Guidance"), dated July 27, 2000.  See EEOC Guidance No. 915.002, 2000 WL 33407181 (July 27, 2000).  The Inquiries and Examinations Enforcement Guidance, however, is only worthy of <u>Skidmore</u> deference based on its "power to persuade."  <u>See</u> <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000) (withholding <u>Chevron</u> deference from agency interpretations such as "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law").  The persuasive value of the Inquiries and Examinations Enforcement Guidance is limited in this case to the extent that (1) the relevant provisions primarily advise on the standards governing examinations or inquiries directed toward a particular employee; and (2) it predates <u>Conroy</u>, which speaks directly to the standard governing an employer's general policy of examinations or inquiries.

Relying on district court decisions from outside this Circuit, PAPBA contends that to comply with the ADA, the Port Authority's policy may only require employees to submit to a medical examination "when there is substantial reason to doubt the employee's ability to perform the essential functions of the job." (Plaintiff's Brief in Support of Motion for Summary Judgment ("Plaintiff's Brief"), ECF No. 50, at 5.) But this standard cannot logically apply to a general policy of medical examinations or inquiries. The cases on which PAPBA relies address the separate factual scenario involving an individual employee—if individualized evidence were required before a generalized policy could be implemented ex ante, then no policy could ever be implemented.

Instead, Conroy illumines the "different approach that a court should take in addressing a general policy rather than an employer's inquiry or examination of an individual employee." Conroy, 333 F.3d at 100. As with an employer's inquiry or examination of an individual employee, the court must carefully analyze whether "the employer's subjection of a particular class of employees" to a general policy of examination or inquiry is consistent with business necessity. Conroy, 333 F.3d at 101. The employer "need not make a particularized showing that the inquiry is justified with respect to each individual employee," but must show that the policy is justified with respect to the affected class. Transp. Workers Union of Am., Local 100, AFL-CIO v. N.Y.C. Transit Auth., 341 F. Supp. 2d 432, 447 (S.D.N.Y. 2004); see Conroy, 333 F.3d at 97 (endorsing district court's general approach requiring the employer to "demonstrate some reasonable basis for concluding that the inquiry was necessary" as to the employee or class of employees). Put differently, although employers are afforded deference in defining a class subject to a general policy, "the employer must show that it has reasons consistent with business necessity for defining the class in the way that it has." Conroy, 333

9

F.3d at 101.

In sum, to satisfy the business necessity exception for requiring annual medical examinations and fitness-for-duty examinations, the Port Authority must show (1) that the asserted purpose for the policy is vital to its business; (2) the class of employees that is subjected to the policies is defined based on grounds consistent with business necessity; and (3) that the policy genuinely serves the business necessity and that the examination is no broader or more intrusive than necessary.  See Transp. Workers Union of Am., Local 100, AFL-CIO, 341 F. Supp. 2d at 448; accord Conroy, 333 F.3d at 101.

B.   Whether the Annual Medical Examinations Violate the ADA

As an initial matter, neither party disputes—and this Court agrees—that the Health Questionnaire and physical examination may reveal whether the Port Authority police officer is an individual with a disability and the nature or severity of a disability.  Thus, regardless of whether the annual medical examination may also constitute an inquiry into the ability of an employee to perform job-related functions permitted by 42 U.S.C. § 12112(d)(4)(B), it must be "job-related and consistent with business necessity" under § 12112(d)(4)(A) to comport with the ADA.  See Margherita v. FedEx Express, 511 F. App'x 71, 72 (2d Cir. 2013) (summary order).

The Port Authority argues that the annual medical examination is job-related and consistent with business necessity.  Specifically, it claims that the purpose of annual medical examinations is to ensure that police officers possess the requisite physical health to perform the essential functions of the job and to assess whether the officer has a condition that might interfere with his ability to perform.  Stated differently, the annual medical examination is needed given the safety-sensitive nature of being a police officer, which includes responding to

10

emergency situations and being authorized to carry a firearm.  (Martin Aff. II ¶ 2.)

        PAPBA counters that compulsory annual medical examinations are not a business necessity for police departments because neither the New York City Police Department nor the Metropolitan Transportation Authority Police Department had required their police officers to submit to such examinations.  (Plaintiff's Brief, at 3 (citing Plaintiff's Rule 56.1 Statement ¶ 4; Lenzo Decl., Ex. 3).)  But as the Second Circuit has noted, "what constitutes a business necessity will undoubtedly vary in different workplaces," <u>Conroy</u> 333 F.3d at 99, which is no less true among police departments of different sizes and with different structures, functions, and priorities.  Moreover, the relevant inquiry is not whether any particular examination or inquiry is vital to the business, but whether the <u>purpose</u> of the examination or inquiry is a business necessity.  Here, the record reflecting the duties and responsibilities of Port Authority police officers establishes that the Port Authority's asserted purpose of ensuring that its police officers can adequately safeguard its facilities and the safety of those who patronize them is a <u>bona fide</u> business necessity.  The "danger that may be posed" by a police officer who is mentally or physically unfit is "obvious and undisputed."  <u>See Transp. Workers Union of Am., Local 100, AFL-CIO</u>, 341 F. Supp. 2d at 449-50.

        However, the Port Authority's business necessity defense falls short because it fails to demonstrate that it has a reasonable basis to suspect that the class subject to the mandatory comprehensive annual medical examinations presents a safety risk or that requiring the examinations is a "reasonably effective method" of decreasing that risk that is "no broader or more intrusive than necessary."  <u>See Conroy</u>, 333 F.3d at 98.  In defining a class, the employer must have reasons "consistent with business necessity for defining the class the way it has."  <u>Conroy</u>, 333 F.3d at 101.  In other words, there must be some justification for concluding that the

policy is necessary for the class of employees affected, even though the employer need not justify the policy as to each individual employee.  Here, the Port Authority subjects not only all its non-supervisory police officers to the annual medical examination, but also those holding the ranks of sergeant, detective, lieutenant, captain, and above—and regardless of the officer's job assignment.  (Defendant's Response to Plaintiff's Rule 56.1 Statement ¶ 5; see also Martin 30(b)(6) Dep. Tr. at 37:13-39:12, 48:10-48:18.)

But the Port Authority has not submitted any evidence of a reasonable basis to suspect that members of this affected class are unable to perform their duties or pose a public safety risk.  And there is no reason to believe that this class inherently raises concerns about either merely by virtue of their job title as police officers.  Accord Conroy, 333 F.3d at 97 (approving district court's reasoning that "the employer must show that it had some reason for suspecting" that the class of employees would be unable to perform job functions or would pose a safety risk).  While the employer's delineation of a class subject to a policy generally deserves deference, the Port Authority does not appear to have even attempted to draw a class tailored to its public safety rationale.  See Conroy, 333 F.3d at 101-02 (noting that an employer faces a "more difficult" burden in establishing that the business necessity defense applies to a general policy that affects a wide group of employees versus a policy directed toward a narrower group).  Thus, the Port Authority has not demonstrated reasonable grounds to require all of its police officers to submit to annual medical examinations, as opposed to a narrowly defined class of police officers for whom annual medical examinations may be necessary.[4]

---

[4]     This Court observes without deciding that the Port Authority may be able to implement a policy that serves its safety rationale if, for example, the affected class is limited to police officers assigned to units that respond to emergencies or if it can show that there is a reasonable basis to believe that the affected class may be unable to perform their duties safely, such as officers over a certain age or body mass index.  See, e.g., Transp. Workers Union of Am, Local 100, AFL-CIO, 341 F. Supp. 2d at 445 n.58; Parker v. Carrier Corp., 158 F. Supp. 3d 813, 823-24 (D. Neb. Jan. 20, 2016).

As for breadth, OMS's Medical Director consistently described the annual medical examinations as a "comprehensive" physical examination that could identify any health condition or issue that, if left untreated, might eventually impact the police officer's ability to perform the job safely.  (See, e.g., Martin 30(b)(6) Dep. Tr. at 94:22-96:21, 97:22-97:25, 110:22-111:3.)  And importantly, the annual medical examination can also identify conditions having no impact on a police officer's ability to perform the job.  (Martin 30(b)(6) Dep. Tr. at 100:18-100:20.)  While such an examination may be reasonably effective in ferreting out dormant conditions, including those that might ultimately affect an officer's job performance, the annual medical examination is "broader [and] more intrusive than necessary" to achieve this purpose— especially in the absence of some reason to doubt the class's ability to perform the job.  Cf. Grassel v. Dep't of Educ. of City of N.Y., 2017 WL 1051115, at *9 (E.D.N.Y. Mar. 20, 2017).

The Port Authority asserts that the Health Questionnaire and physical examination are based on the Department of Transportation's examinations for commercial drivers, and are thus "no more invasive or broader than that required for licensed interstate commercial drivers who have some of the same job duties of Port Authority police officers."  (Defendant The Port Authority of New York and New Jersey's Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 37 ("Defendant's Memorandum"), at 10-11.)  This approach, however, is misguided because the periodic physical examinations and physical qualifications for commercial drivers are expressly prescribed by federal regulation.  See 49 C.F.R. §§ 391.41, 391.45.  Additionally, the Department of Transportation questionnaire on which the Health Questionnaire is based is, in fact, reproduced in full in the body of the relevant federal regulation.  See 49 C.F.R. § 391.43(f).  Thus, while these regulations set forth the physical qualifications for commercial drivers and the standards by which candidates are examined and

certified, they do not inform the appropriate breadth of medical examinations administered to Port Authority police officers to address an articulated business need.

       Finally, the Port Authority relies on the Inquiries and Examinations Enforcement Guidance's exception permitting, "[i]n limited circumstances, periodic medical examinations of employees in positions affecting public safety," such as police officers or firefighters.  EEOC Guidance No. 915.002, 2000 WL 33407181, at *14.  Whatever the scope and import of this guidance after <u>Conroy</u>, however, it does not apply here because it advises that the examinations should be "narrowly tailored to address specific job-related concerns."  EEOC Guidance No. 915.002, 2000 WL 33407181, at *14.  In contrast, the Port Authority's annual medical examinations are—by its own admission—intended to be comprehensive and to reveal a panoply of conditions, including those having no relevance to an officer's ability to perform the job.  Accordingly, PAPBA's motion for summary judgment as to Count I is granted, and the Port Authority's motion is denied.

       C.  <u>Whether the Fitness-for-Duty Examinations Violate the ADA</u>

       Like the annual medical examinations, the fitness-for-duty examinations for officers injured on duty fall within the purview of § 12112(d)(4) because the medical history and physical examination may reveal a disability or the nature or severity of a disability.  The fitness-for-duty examinations for officers who are absent because of illness or injury not sustained on duty are also within the scope of § 12112(d)(4) because they require the officer to reveal "the nature of the illness or condition causing the absence."  <u>See</u> <u>Transp. Workers Union of Am., Local 100, AFL-CIO</u>, 341 F. Supp. at 438, 447.

       The Port Authority offers several justifications for its fitness-for-duty examinations.  First, the Port Authority contends that the fitness-for-duty examinations for

officers who are injured on duty are necessary to authorize medical treatment, as provided by the workers' compensation statutes of New York and New Jersey.  It asserts that these fitness-for-duty examinations also enable OMS doctors to determine fitness for light duty positions as a means to curb overtime costs.  (See Martin 30(b)(6) Dep. Tr. at 62:20-63:8; Affidavit of Robin Martin, dated March 17, 2017, ECF No. 34 ("Martin Aff. I") ¶ 2.)  Next, the Port Authority advances two business necessities to justify its fitness-for-duty examinations for officers absent due to non-occupational injury or illness: (1) to curb excess absence and overtime costs by using officers in light duty positions; and (2) to determine whether the police officer can safely return to work in some capacity.  (Defendant's Memorandum, at 13-17; see Martin Aff. I ¶ 2.)  This Court analyzes the justifications for injured-on-duty examinations and non-injured-on-duty examinations in turn.

1.  Fitness-for-Duty Examinations for Injury on Duty

The Port Authority requires officers who are injured on duty to submit to an examination generally within 24 hours of the injury so that treatment under workers' compensation can be authorized.  Following this examination, employees who are not fit for duty are directed to report to OMS every two to four weeks, depending on the injury, for evaluation and reauthorization of treatment.  The scope of these examinations is circumscribed by the injury.

In support of this policy, the Port Authority points to the interpretative guidance for the ADA's implementing regulations, which clarifies that 29 C.F.R. § 1630.14(c) "permits periodic physicals to determine fitness for duty or other medical monitoring if such physicals or monitoring are required by medical standards or requirements established by Federal, State, or local law that are consistent with the ADA and this part . . . in that they are job-related and

consistent with business necessity."  29 C.F.R. Part 1630, App'x.  The interpretative guidance

provides several examples of such medical standards or requirements, including (1) federal

safety regulations "that regulate bus or truck driver qualifications"; (2) laws establishing

"medical requirements for pilots or other air transportation personnel"; or (3) statutes that require

"employees exposed to certain toxic and hazardous substance be medically monitored at specific

intervals."  29 C.F.R. Part 1630 App'x.  Unlike these examples, however, New York's and New

Jersey's workers' compensation statutes do not establish any police-related medical standards or

medical requirements.  Rather, the New York statutory provision cited by the Port Authority only

outlines when and how often an employee must provide notice and subsequent progress reports

of medical treatment for a claim to be valid and enforceable against the employer.  See N.Y.

Workers' Comp. Law § 13-a(4)(a).  Likewise, although the New Jersey provision that the Port

Authority invokes mandates that employees submit to examinations following a work-related

injury to receive compensation under the statute, it does not promulgate any medical standards

governing these examinations.  See N.J. Stat. Ann. 34:15-17.  The Appendix to 29 C.F.R. Part

1630 is therefore of little help.

   Moreover, the fact that these workers' compensation provisions allude to periodic

examinations or progress reports for specified statutory purposes does not ipso facto bring the

fitness-for-duty examinations into conformity with the ADA.  For instance, an employee who

suffers an occupational injury may be required to undergo physical examinations under New

Jersey's workers' compensation statute without implicating the ADA—whether because the

occupational injury is not a disability under the ADA, or because the examination does not reveal

that the employee has a disability or the nature or severity of the disability.  But here, the fitness-

for-duty examinations fall within the ambit of § 12112(d)(4) because they may reveal that an

individual is disabled or the nature or severity of the disability.  Thus, to pass muster under the

ADA, the policy subjecting police officers who are injured on duty to these fitness-for-duty

examinations must satisfy the business necessity defense.

This Court's research has not unearthed any case authority explicitly analyzing

whether the authorization of medical treatment for workers' compensation may constitute a

business necessity.  Here, the EEOC's enforcement guidance is instructive.  See Conroy, 333

F.3d at 95 (describing such agency publications as "at least a body of experience and informed

judgment to which courts . . . may properly resort for guidance" (quotation marks omitted)).  In

guidance titled "Workers' Compensation and the ADA," the EEOC states that "[t]he ADA does

not prohibit an employer . . . from asking disability-related questions or requiring medical

examinations" of an employee with an occupational injury "that are necessary to ascertain the

extent of its workers' compensation liability."  EEOC Guidance No. 915.002, 1996 WL

33161338, at *3 (Sept. 3, 1996).  Determining whether an employee is eligible for worker's

compensation benefits is particularly vital in this case, where the Port Authority must approve all

medical bills and render payment as a self-insured.  (See Plaintiff's Response to Defendant's

Rule 56.1 Statement ¶ 23; Martin 30(b)(6) Dep. Tr. at 46:23-47:14; Miller Opp. Decl., Ex. M.)

Therefore, the Port Authority has established that authorizing medical treatment for workers'

compensation is a valid business necessity.

In addition to establishing that authorizing treatment for workers' compensation is

a business necessity, the Port Authority must also demonstrate that the class subjected to the

policy is reasonably defined.  Here, the injured-on-duty fitness-for-duty examinations apply only

to Port Authority police officers who sustain an occupational injury.  The justification for

limiting these examinations to this class of police officers is almost by definition consistent with

the articulated business necessity.  Conroy, however, also requires that the policy of fitness-for-duty examinations for officers injured on duty genuinely serve the need to authorize workers' compensation treatment, and that the examinations be no broader or more intrusive than necessary.  Accord EEOC Guidance No. 915.002, 1996 WL 33161338, at *3 ("However, the questions and examinations must be consistent with the state law's intended purpose of determining an employee's eligibility for workers' compensation benefits. . . . Examinations and questions must be limited in scope to the specific occupational injury and its impact on the individual and may not be required more often than necessary to determine an individual's initial or continued eligibility for workers' compensation benefits.")  The undisputed record reflects that the fitness-for-duty examinations are tailored to the employee's "chief complaint" and are limited in scope to formulating a working diagnosis.  (Miller Decl., Ex. D; Lenzo Decl. Ex. 19; see also Martin 30(b)(6) Dep. Tr. at 62:11-62:19.)

PAPBA contends that because the Port Authority's doctors specialize only in internal medicine, occupational medicine, and gastroenterology, there are "myriad medical conditions" that its doctors are not qualified to diagnose or treat.  (Plaintiff's Brief, at 3 (citing Martin 30(b)(6) Dep. Tr. at 51:11-53:11).)  But PAPBA does not come forward with evidence to support this proposition, or to refute the Port Authority's evidence that its doctors are "all occupational specialists because they have worked in this field for a number of years" and are "experienced in evaluating occupationally-related illnesses and injuries."  (Martin 30(b)(6) Dep. Tr. at 53:12-53:23.)  No reasonable jury could find that having the Port Authority's doctors conduct these fitness-for-duty examinations is not a "reasonably effective method" of determining eligibility for workers' compensation.  See Conroy, 333 F.3d at 88.  Thus, this Court concludes that these examinations actually contribute to the Port Authority's authorization of

medical treatment by allowing it to ascertain the officer's eligibility for workers' compensation without being broader than necessary to diagnose the condition.  As such, the Port Authority satisfies the business necessity exception as to these injured-on-duty fitness-for-duty examinations.[5]  The Port Authority's motion for summary judgment is granted for these fitness-for-duty examinations, and PAPBA's motion is denied.

## 2.   Fitness-for-Duty Examinations for Injury or Illness Not Sustained on Duty

The fitness-for-duty examinations for officers who are absent because of non-work-related injury or illness generally mirror those for officers who are absent because of work-related injuries.  Police officers who fall in the former category must report to OMS on their sixth day of absence, and then every two to four weeks depending on the injury or illness.

The threshold inquiry for determining whether the business necessity defense has been satisfied asks whether the asserted purpose behind the policy of medical examinations or inquiries is vital to the business.  The Port Authority contends that the sick leave fitness-for-duty examinations are necessary (1) to curb excess absence and overtime costs by using officers in light duty positions; and (2) to determine whether the police officer can safely return to work in some capacity.  In support of the first justification, the Port Authority submitted records that estimate the yearly cost of sick leave to the Port Authority as well as the estimated cost of overtime backfill as a result of sick leave.  According to the Port Authority, these records indicate that "since 2009, sick/absence has cost the Port Authority in excess of $11 million a year and that in 2015, it cost $15,340,506."  (Plaintiff's Response to Defendant's Rule 56.1 Statement

---

[5]        Given this conclusion, this Court need not reach the question of whether the injured-on-duty fitness-for-duty examinations would also be permissible based on the Port Authority's articulated purpose of reducing excess overtime costs.  In any event, the Port Authority has not established that curbing excess overtime costs is vital to its business for the reasons set forth below.

¶ 34.)  While these costs are no doubt significant,[6] the Port Authority does not provide any evidence indicating how much of these costs are attributable to <u>excessive</u> absences or evidence quantifying the costs that would be saved by using officers in light-duty positions.  On this record, this Court cannot conclude that the Port Authority's general desire to reduce sick leave and overtime costs—a "mere expediency" doubtlessly shared by <u>any</u> employer—rises to the level of being vital to its business.  <u>See</u> <u>Conroy</u>, 333 F.3d at 97 ("An employer cannot simply demonstrate that an inquiry is convenient or beneficial to its business.")

The Port Authority's second rationale—ensuring that its police officers can safely return to work—is a valid business necessity, given the Port Authority's responsibility for maintaining safety and security at its facilities and responding to emergencies.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶¶ 6-9.)  But the Port Authority's business necessity defense is scuttled by its failure to demonstrate that it has reasonably defined the class affected by this policy.  Specifically, the Port Authority does not offer any evidence showing that police officers who have been out on sick leave for more than five days would pose a safety risk or be unable to discharge their responsibilities when they return to work.  <u>Cf.</u> <u>Transp. Workers Union of Am.</u>, 341 F. Supp. 2d at 451 & n.90 (finding the New York City Transit Authority's policy of requiring employees returning from sick leave to disclose their diagnosis was justified for bus operators where "[t]he Authority ha[d] presented evidence that it has a reasonable basis for concluding that bus operators who require sick leave pose a genuine safety risk").

Further, the uncontroverted record indicates that Port Authority police officers may be "engaged in a multitude of tasks which involve a broad range of physical and mental

---

[6]     Based on the Port Authority's records, the $11 million and $15,340,506 figures in fact quantify the total estimated cost of <u>injured-on-duty</u> time, not sick time.  (Miller Decl., Ex. E.).  Nevertheless, the total estimated cost of sick time is in the same ballpark—since 2009, sick/absence has cost the Port Authority over $9 million per year, and $13,684,610 in 2015.

requirements in the context of different types of safety and security risks."  Fountain, 2005 WL 1502146, at *10.  In particular, the MOA's description of job duties for non-supervisory police officers suggests that depending on the assignment, a police officer may perform very disparate tasks, such as (1) operating marine craft in the event of an emergency; (2) checking the weight, size, and cargo of vehicles entering Port Authority facilities; and (3) maintaining records, preparing reports and work schedules, and checking roll calls and squad assignments—some of which appear to be entirely administrative.  (Miller Decl., Ex. A, at 212-14 ("When assigned to Central Police Desk, is responsible for the assignment of central police pool personnel, proper notification of supervisors in cases of serious occurrences and the maintenance of records.").) Lumping all police officers together without regard to whether their assignments implicate public safety does not forge a class consistent with that business necessity.  Accord Fountain, 2005 WL 1502146, at *10.

   The Port Authority bears the burden of establishing business necessity.  Because it has failed to meet its burden as to sick leave fitness-for-duty examinations, this Court need not determine whether the Port Authority's policy requiring officers who have been out sick for at least five days to be examined every two to four weeks genuinely contributes to the stated end and is no broader or more intrusive than necessary.  For the foregoing reasons, PAPBA's motion for summary judgment is granted as to the sick leave fitness-for-duty examinations, and the Port Authority's motion is denied.

II.  Count III – FMLA Claim

   The first two iterations of the complaint sought relief only for the Port Authority's purported violations of the ADA.  (See ECF Nos. 1, 20.)  On March 27, 2017, PAPBA filed a Second Amended Complaint (the "Complaint" or "SAC") appending a count alleging that the

fitness-for-duty examinations also violate FMLA.  At oral argument, this Court notified the

parties of its intent to grant summary judgment on Count III in favor of the Port Authority on

grounds not raised by either party and allowed the parties time to respond pursuant to Fed. R.

Civ. P. 56(f)(2).  See Willey v. Kirkpatrick, 801 F.3d 51, 62 (2d Cir. 2015).  Having considered

the supplemental letter briefs submitted by each party, this Court grants summary judgment on

Count III in favor of the Port Authority and denies PAPBA's motion as to this claim.

        A.  Whether PAPBA May Assert a FMLA Claim on Behalf of its Members

Count III fails because as a labor union, PAPBA cannot bring an action under

FMLA as a matter of law, whether on its own or on behalf of its members.  New York Metro

Area Postal Union v. Potter, 2003 WL 1701909, at *2 (S.D.N.Y. Mar. 31, 2003); see also Burrell

v. AT&T Corp., 2005 WL 2656124, at *3 (S.D.N.Y. Oct. 18, 2005).  FMLA provides a private

right of action only to "one or more employees for and in behalf of (A) the employees; or (B) the

employees and other employees similarly situated" against an employer to recover relief under

29 U.S.C. § 2617(a).[7]  29 U.S.C. § 2617(b) (emphasis added); see also 29 C.F.R. § 825.400

("The employee has the choice of . . . [f]iling a private lawsuit pursuant to section 107 of . . .

FMLA." (emphasis added)).  FMLA expressly imports FLSA's definition of "employee."  See

29 U.S.C. § 2611(3).  Under FLSA, an "employee" is "any individual employed by an

employer."  29 U.S.C. § 203(e)(1).  FMLA also defines "eligible employee" as an individual

"who has been employed (i) for at least 12 months by the employer . . .; and (ii) for at least 1,250

hours of service with such employer during the previous 12 month period."  29 U.S.C. § 2611(2).

Because labor unions plainly do not fit within either the definition of "employee"

---

[7]      Section 2617(a) mandates that an "employer who violates section 2615 of this title shall be liable to any
eligible employee . . . ."  29 U.S.C. § 2617(a) (emphasis added).  Section 2615 provides in turn that "[i]t shall be
unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right
provided under [Subchapter I]."  29 U.S.C. § 2615(a)(1).

or "eligible employee," they are statutorily barred from bringing FMLA claims on their own.

New York Metro Area Postal Union, 2003 WL 1701909, at *2; see Burrell, 2005 WL 2656124,

at *3.  Nor may labor unions bring a FMLA action on behalf of their members.  Like other

judges in this District, this Court finds the rationale of Local 100, Service Employees

International Union, AFL-CIO v. Integrated Health Services, Inc. persuasive.  In Integrated

Health Services, the court observed that the definition of "employee" under FLSA "does not

empower a union or labor organization to sue on behalf of its members for violations of FLSA."

Integrated Health Servs., Inc., 96 F. Supp. 2d 537, 539 (M.D. La. 2000), order vacated on other

grounds.  And because FMLA's legislative history reveals that Congress "was aware of the

breadth of . . . FLSA['s] definition [of employee] and purposely chose to adopt that definition" in

enacting FMLA, the court concluded that unions are similarly precluded from suing on behalf of

their members under FMLA.[8]  Integrated Health Servs., Inc., 96 F. Supp. 2d at 539 (alteration in

original); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal

Texts 322-326 (2012) (containing an extended discussion of the prior-construction canon).

        In its supplemental letter brief, PAPBA contends that Integrated Health Services

and New York Metro Area Postal Union are incorrectly decided because they "conflat[e] the

concepts of associational standing and actual standing."  (PAPBA Supp. Ltr. Br., ECF No. 58, at

2.)  In particular, PAPBA argues that it has associational standing under Hunt v. Washington

State Apple Advertising Commission, which permits an association that has not itself suffered

any injury to "bring suit on behalf of its members when (a) its members would otherwise have

---

[8]      At oral argument, PAPBA's counsel pointed to ADA cases holding that labor unions may sue under the ADA on behalf of their members.  See Transp. Workers Union of Am. v. N.Y.C. Transit Auth., 342 F. Supp. 2d 160 (S.D.N.Y. 2004); Pa. State Troopers Ass'n v. Miller, 621 F. Supp. 2d 246 (M.D. Pa. 2008).  But those cases offer no refuge for PAPBA's contention that it may bring suit on behalf of its members under FMLA.  As courts in this Circuit have recognized, while Congress intended FMLA and FLSA to prohibit unions from asserting claims on behalf of their members, there is no basis to believe that Congress intended the ADA to be analogous to FMLA or FLSA.  Small v. Gen. Nutrition Cos., 388 F. Supp. 2d 83, 96 (E.D.N.Y. 2005).

standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit."  432 U.S. 333, 343 (1977).  But PAPBA's

argument misses the mark because the issue of whether PAPBA satisfies the Hunt test—i.e.,

whether it has third-party standing to raise the rights of its members—is a prudential standing

inquiry entirely separate from the statutory "question of whether the particular plaintiff 'has a

cause of action under the statute.'" Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821

F.3d 352, 359-60 (2d Cir. 2016) (citing Lexmark Int'l, Inc. v. Static Control Components, Inc.,

134 S. Ct. 1377, 1387 (2014)); see Am. Psychiatric Ass'n, 821 F.3d at 359 ("Because Congress

specified in the statute who may sue, prudential standing principles do not apply.).

        Despite PAPBA's arguments to the contrary, neither New York Metro Area

Postal Union nor Integrated Health Services vitiates the first element of the Hunt test.  Those

cases simply analyzed whether labor unions have a cause of action under FMLA by

"determin[ing] the meaning of the congressionally enacted provision creating a cause of action"

using "traditional principles of statutory interpretation."  Lexmark Int'l, Inc., 134 S. Ct. at 1387-

88.  "This inquiry 'does not belong' to the family of standing inquiries . . . because 'the absence

of a valid . . . cause of action does not implicate subject-matter jurisdiction.'"[9] Am. Psychiatric

Ass'n, 821 F.3d at 359.  Having created a private right of action under FMLA, Congress

---

[9]        Tellingly, Hunt itself did not concern an instance in which Congress had defined a class of plaintiffs who
could bring an action under a particular statute.  Local 1035, cited by PAPBA in its supplemental letter brief, is
likewise distinguishable.  In that case, the court rejected the defendant's assertion that the plaintiff labor union did
not have standing because a Connecticut statute did not expressly provide for associational standing.  Local 1035,
Int'l Bhd. of Teamsters v. Pepsi-Cola Allied Bottlers, Inc., 83 F. Supp. 2d 301, 303-04 (D. Conn. 1999).  But that
court did not—unlike New York Metro Area Postal Union or Integrated Health Services—analyze FLSA.  Even if it
had, its persuasive value is undercut by American Psychiatric Association and Lexmark International's clarification
that whether an act of Congress permits a particular plaintiff to avail itself of statutory relief is distinct from
constitutional or prudential standing doctrines.

undoubtedly also has "the power to prescribe the conditions on which such right shall be enjoyed." Authors Guild, Inc. v. HathiTrust, 902 F. Supp. 2d 445, 451 (S.D.N.Y. 2012), vacated in part on other grounds, 755 F.3d 87 (2d Cir. 2014) (quotation mark omitted).  In other words, "Congress may define standing[10] as to a particular cause of action more narrowly than what is constitutionally permitted."  Authors Guild, Inc., 902 F. Supp. 2d at 452.  Congress has done exactly that in the FMLA context by restricting the class of plaintiffs authorized to sue under § 2617(a) by excluding unions.  See Am. Psychiatric Ass'n, 821 F.3d at 360 ("[W]e cannot expand the congressionally-created statutory list of those who may bring a cause of action by importing third-party prudential considerations.").

Because further discovery cannot change the fact that PAPBA may not bring an action under FMLA on behalf of its members, the Port Authority is entitled to judgment as a matter of law, and PAPBA's FMLA count is dismissed.  See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 80 (2d Cir. 2014) (instructing that before granting summary judgment sua sponte, the court "must assure itself that following the procedures set out in Rule 56 [(a)-(e)] would not alter the outcome").

B.  Leave to Amend

As a last resort, PAPBA's supplemental letter brief requests leave to reinstate Officer Joseph Arias as a plaintiff "solely as to the FMLA claim based on the factual allegations that were originally pleaded on Officer Arias's behalf . . . ."  (PAPBA Supp. Ltr. Br., at 4.)  But those allegations—even when supplemented by statutory allegations that Officer Arias had worked for the Port Authority for at least one year as of his December 7, 2014 injury and that he

---

[10]      Whether a plaintiff has a cause of action under a statute was formerly known as "statutory standing."  As the Second Circuit has recognized, however, "the 'statutory standing' appellation is 'misleading' and 'a misnomer.'"  Am. Psychiatric Ass'n, 821 F.3d at 359.  Accordingly, this Court avoids that terminology.

worked at least 1,250 hours in the preceding twelve months—cannot be forged into a valid

FMLA claim.  (PAPBA Supp. Ltr. Br., at 5.)

        While courts should "freely give leave when justice so requires" as mandated by

Rule 15(a)(2), a court may exercise its discretion to deny leave to amend if, for example, the

amendment will be futile or if granting leave would result in undue prejudice to the opposing

party.  <u>Williams v. Citigroup Inc.</u>, 659 F.3d 208, 213-14 (2d Cir. 2011) (per curiam) (citing

<u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)); <u>see also</u> <u>Lucente v. Int'l Bus. Machs. Corp.</u>, 310

F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be

productive, however, it is not an abuse of discretion to deny leave to amend.").  An amendment

is futile "if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ.

P. 12(b)(6)."  <u>Lucente</u>, 310 F.3d at 258.  A party may be prejudiced if the amendment would "(i)

require the opponent to spend significant additional resources to conduct discovery and prepare

for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from

bringing a timely action in another jurisdiction."  <u>Pasternack v. Shrader</u>, 863 F.3d 162, 174 (2d

Cir. 2017).

        With these principles in mind, PAPBA's request to amend the Complaint is

denied.  FMLA makes it unlawful for employers to "interfere with, restrain, or deny the exercise

of" FMLA rights.[11]  <u>Sista v. CDC Ixis N. Am.</u>, 445 F.3d 161, 174 (2d Cir. 2006).  To state such

an "interference" claim, a plaintiff must establish "(1) that she is an eligible employee under . . .

FMLA; (2) that the defendant is an employer as defined by . . . FMLA; (3) that she was entitled

to take leave under . . . FMLA; (4) that she gave notice to the defendant of her intention to take

---

[11]    FMLA also prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by FMLA.  29 U.S.C. § 2615(a).  This specie of FMLA claim is not at issue in this case.

leave; and (5) that she was denied benefits to which she was entitled under . . . FMLA."

Coutard, 848 F.3d at 109 (emphasis omitted). The parties' quarrel centers on the adequacy of

notice that must be provided for FMLA to be implicated. The Second Circuit answered this

question in Coutard, which held that "the obligation of an employee to give notice of his need for

FMLA leave is not the obligation . . . to provide the employer with all of the necessary details to

permit a definitive determination of . . . FMLA's applicability at or before the time of the

request," but "in the absence of a request for additional information, an employee has provided

sufficient notice to his employer if that notice indicates reasonably that . . . FMLA may apply."

Coutard, 848 F.3d at 111.

But PAPBA's proposed amendments put the cart before the horse. PAPBA fails

to plausibly allege that Officer Arias provided adequate notice to the Port Authority of his intent

to take FMLA leave[12]—much less that Officer Arias suffered an injury or interference with his

exercise of or attempt to exercise his FMLA rights. PAPBA's only contention on this score is a

sinewy claim that the Port Authority purportedly failed to comply with FMLA regulations. Cf.

Smith v. Westchester Cty., 769 F. Supp. 448, 468 (S.D.N.Y. 2011) (finding that "technical

violations" without allegations of resulting harm do not state a FMLA interference claim);

Donnellan v. N.Y.C. Transit Auth., 1999 WL 527901, at *4 (S.D.N.Y. July 22, 1999)

(dismissing plaintiff's FMLA interference claim where plaintiff had not shown that technical

violations of FMLA's designation regulations had denied plaintiff her FMLA rights). Even

viewing PAPBA's claim in a light most favorable to plaintiff, the proposed FMLA claim cannot

survive a motion to dismiss, and leave to amend would be futile.

Further, while PAPBA's supplemental letter glibly asserts that additional

---

[12] PAPBA's failure to allege that the Port Authority is an "employer" under FMLA—while curable—is emblematic of its pleading defects for this claim.

discovery is unnecessary if leave to amend is granted, (PAPBA Supp. Ltr. Br., at 5), this Court is unconvinced.  For one thing, although discovery in this action for Counts I and II has been complete since March 13, 2017, (see March 13, 2017 Joint Letter, ECF No. 21), there is no indication that any discovery has been taken as to Officer Arias.  In particular, the record is bereft of any reference to Officer Arias that would allow this Court to determine whether any notice he may have provided to the Port Authority was sufficient to trigger FMLA obligations with respect to the Port Authority fitness-for-duty examination policy.  And because "adequacy of notice is usually a fact-specific question," Coutard, 848 F.3d at 109, discovery on this issue would likely be necessary to resolve the FMLA claim, further delaying resolution of this case.

In addition to the futility of the proposed amendments and the likelihood of further delay if leave to amend were granted, the late stage of this action counsels against granting leave.  Courts in this Circuit have "consistently found prejudice and denied amendments where discovery has already been completed and summary judgment motions have been filed." Greenberg v. Malkin, 39 F. App'x 633, 637 (2d Cir. 2002) (summary order) (quotation mark omitted).  Requests to amend are "particularly disfavored where the amendment is proposed in response to a summary judgment motion," especially where discovery has already been completed.  Williams v. Bank Leumi Trust Co. of N.Y., 2000 WL 343897, at *2 (S.D.N.Y. Mar. 31, 2000) (citing Ansam Assoc., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985)); see also Sec. Exch. Comm'n v. Norton, 21 F. Supp. 2d 361, 363 (S.D.N.Y. 1998) (denying the SEC's request to amend "at this very late stage in the litigation" made "solely to avoid an adverse ruling on this summary judgment motion").

Finally, PAPBA suggests that its failure to name a plaintiff who could properly assert a FMLA claim is attributable to the Port Authority's failure to raise PAPBA's "purported

lack of standing . . . until its reply brief."  (PAPBA Supp. Ltr. Br., at 4 n.1.)  This argument is

unpersuasive.  Courts are "free to conclude that ignorance of the law is an unsatisfactory excuse"

for delay in requesting leave to amend.  Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d

Cir. 1990).  There is no reason that PAPBA could not have named an individual plaintiff on

March 27, 2017, when PAPBA filed its second amended complaint appending the FMLA claim.

See Berman v. Parco, 986 F. Supp. 195, 217 (S.D.N.Y. 1997) ("Leave to amend a complaint will

generally be denied when the motion to amend is filed solely in an attempt to prevent the Court

from granting a motion to dismiss or for summary judgment, particularly when the new claim

could have been raised earlier." (quotation marks omitted)).

CONCLUSION

The Port Authority undoubtedly serves a vital public interest in safeguarding and

securing its facilities.  This Court recognizes the wisdom in requiring police officers to undergo

regular medical screening or medical examinations to ensure that they can protect the public.

But where such examinations implicate the privacy interests under the ADA, they must be

consistent with business necessity.  The Port Authority makes that showing for its injured-on-

duty fitness-for-duty examinations, and this Court grants summary judgment to the Port

Authority with respect to those examinations.  But because the Port Authority has not established

that its compulsory annual medical examinations or sick leave fitness-for-duty examinations are

consistent with business necessity, the ADA compels summary judgment for PAPBA on those

examinations.

Nevertheless, this Court would be remiss if it did not express skepticism about a

labor union negotiating healthcare benefits for its members and then turning around and suing

the employer to rescind some of them.  This irony is particularly stark given the current

29

healthcare debate in the United States and the worries of many Americans about whether their medical needs will be met.  Port Authority police officers enjoy better healthcare than most Americans.  Their collective bargaining agreement requires the Port Authority to pay the full premium costs for their healthcare insurance.  Until today, not only did Port Authority police officers have free medical care, they received a day's pay for submitting to an annual medical examination.  This Court wonders how many Americans would welcome such a generous arrangement.

PAPBA's motion is granted in part and denied in part, and the Port Authority's motion is granted in part and denied in part.  The parties are directed to submit a proposed judgment consistent with this Opinion & Order by November 3, 2017.  The Clerk of Court is directed to terminate the motions pending at ECF No. 31 and ECF No. 49.

Dated: October 24, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.